## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DONALD HESS, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>    v.<br><br>MIDWEST GAMING & ENTERTAINMENT, LLC d/b/a RIVERS CASINO,<br><br>          Defendant. | Case No.: 23-cv-16791<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Donald Hess ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Midwest Gaming & Entertainment, LLC d/b/a Rivers Casino ("Rivers Casino" or "Defendant"), to obtain damages, injunctive relief, and restitution for a prospective Class as defined below. Plaintiff makes the following allegations upon information and belief, the investigation of his counsel, and facts that are available as a matter of public record.

## NATURE OF THE ACTION

1. This is a data breach class action brought on behalf of consumers whose sensitive personal information was stolen after a cybersecurity breach at Rivers Casino starting in August 2023 (the "Data Breach").

2. The information stolen in the Data Breach included individuals' private, sensitive information, including, but not limited to, full names, phone numbers, email addresses, dates of birth, driver's licenses, government ID numbers, financial account numbers, tax identification numbers, passport numbers, and Social Security numbers (collectively "PSI").

3. As a result of the Data Breach, Plaintiff and Class Members have recognizable

losses which include the loss of sensitive personal information subject to an increased risk of identity theft or fraud, the loss of the benefit of contractual bargain, and the loss of time and resources for the rectifying or mitigating the effects of the Data Breach.

4.    Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate security measures for the safeguarding of Class members' PSI and failing to notify Class Members of the Data Breach in a timely manner.

5.    Moreover, Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's reckless handling of class members' PSI. Defendant's maintenance and control of their internal servers and computer network left PSI vulnerable to external attacks. Upon information and belief, Defendant's lack of proper encryption protocols and software particularly left Defendant's internal servers and networks defenseless against third-party attacks.

6.    Upon information and belief, Defendant must have, or alternatively should have known, of the foreseeable risk of potential cyber attacks on their internal servers and computer networks. Consequently, Defendant was on notice that the failure to properly maintain computer network security could compromise class members' PSI and cause future harm.

7.    Additionally, Defendant and its employees or agents failed to properly and adequately monitor its computer network and servers that maintained the PSI. With more diligent monitoring and upkeep of their network and servers, Defendant would have discovered the cyber intrusion sooner, allowing for Plaintiff and Class Members to be notified more promptly.

8.    As a result of the Data Breach, Plaintiff and Class Members have suffered injury

2

and damages because of the theft and misuse of their PSI. Particularly, Plaintiff and Class Members face the increased and imminent lifetime risk of identity theft.

9.      Using the information implicated in the Data Breach, cyber criminals can assume victims' identities for criminal purposes, including but not limited to: filing fraudulent tax returns, misappropriating credit history, making financial transactions on behalf of victims (e.g., opening credit accounts in victims' names), impersonating victims via mail and/or email, impersonating victims in cyber forums and social networks, stealing benefits belonging to victims, and committing illegal acts that potentially incriminate victims.

10.     Plaintiff's and Class Members' PSI was compromised directly because of Defendant's negligence, causing Plaintiff and Class Members' to be at risk of personal, financial, and social harm for the foreseeable future.

11.     Plaintiff and Class Members may also incur out of pocket costs for services such as credit monitoring, credit freezes, frequent credit reporting, or other protective measures to deter, detect, and protect their sensitive information.

12.     Plaintiff brings this action on behalf of all persons whose PSI was compromised as a result of Defendant's failure to: (i) adequately protect consumers' PSI; (ii) adequately warn its current and former customers and potential customers of the inadequacy of Defendant's security practices; and (iii) effectively monitor computer network and server platforms for its ineffective security measures (the "Class").

13.     Defendant has directly and proximately caused Plaintiff and the Class to suffer injury in the form of: (i) invasion of privacy; (ii) theft of their PSI; (iii) lost or diminished value of PSI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual

consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk to their PSI, which (a) remains unencrypted and available for unauthorized use by third parties, and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures if Defendant fails to rectify their security measures to properly protect the PSI.

14.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief for the improvement of Defendant's security systems, future annual audits, and adequate credit monitoring and identity restoration services funded by Defendant.

15.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct.

## PARTIES

16.     Plaintiff Donald Hess is a natural person residing in Milwaukee, Wisconsin. On or about November 20, 2023, Plaintiff was informed by letter that he had been a victim of the Data Breach.

17.     Defendant Midwest Gaming & Entertainment, LLC d/b/a Rivers Casino is a for-profit Delaware limited liability corporation with its principal place of business at 900 N. Michigan Ave., Suite 1600, Chicago, Illinois. Upon information and belief, Defendant is a wholly-owned subsidiary of Rush Street Gaming, LLC, a Delaware limited liability corporation with its principal place of business at the same address.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds $5,000,000,

exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of this class fulfills diversity by being a citizen of a state different from Defendant.

19.     This court has personal jurisdiction over Defendant because Defendant's principal place of business is located within this District.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## **FACTUAL ALELGATIONS**

### *Defendant's Business*

21.     Defendant is a casino located in Des Plaines, Illinois, that offers gambling, dining, and other entertainment services to its patrons.

22.     Plaintiff and Class Members are current and former patrons and/or employees at Rivers Casino.

23.     To be entitled to the services offered by Defendant, patrons, like Plaintiff and Class Members, must entrust Defendant highly sensitive personal information such as:

a.  Contact and account information like names, usernames, passwords, addresses, telephone numbers, email addresses, and household members;

b.  Social Security numbers, and/or driver's license numbers; and

c.  Payment information, such as credit card, debit card, and/or bank account numbers.

5

24.     Similarly, as a condition of obtaining employment at Defendant, Rivers Casino requires that its employees, including some Class Members, entrust it with highly sensitive personal information described above.

25.     Defendant retains this sensitive personal information to derive substantial economic benefit from the PSI. But for the collection of Plaintiff's and Class Members' PSI, Defendant would be unable to perform its services.

26.     The information held by Defendant in its internal computer servers and network at the time of the Data Breach included unencrypted and/or insufficiently encrypted PSI of Plaintiff and Class Members.

27.     Upon information and belief, Defendant made representations to its patrons and employees, including Plaintiff and Class Members, that the PSI collected as a condition of employment or access to Defendant's services would be kept secure, private, confidential, and that Defendant would delete any sensitive information after it was no longer needed to maintain their systems or services.

28.     Indeed, Defendant's Privacy policy reassures patrons and employees, including Plaintiff and Class members, that "[w]e use commercially reasonable measures to provide our Services."[1]

29.     As such, Plaintiff and Class Members provided their PSI with the reasonable expectation and understanding that Defendant would comply with its obligations and reassurances that such sensitive personal information would remain confidential and secure from unauthorized access.

---

[1] https://www.riverscasino.com/desplaines/privacy-policy

30.     Defendant had the legal duty created by the FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to adopt reasonable measures to protect the PSI of Plaintiff and Class Members from unauthorized access from and involuntary disclosure to third parties. Further, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PSI, Defendant not only assumed, but knew or should have known that it assumed legal and equitable duties for the protection of Plaintiff's and Class Members' PSI from disclosure.

***The Data Breach***

31.     On or about November 20, 2023, Defendant began sending Plaintiff and other Data Breach victims a Notice of the Data Breach letter (the "Notice Letter"). A true and correct copy of this letter is attached to this Complaint as Exhibit A. The Notice Letter includes the following representation:

*What Happened?*
While our operations were not impacted, Rivers determined that this incident involved unauthorized access to our network. Specifically, on November 2, 2023, we determined that files containing certain personal information of Rivers Casino Des Plaines Team Members, customers, and online sportsbook customers may have been accessed or removed from our network as a result of this incident on or around August 12, 2023. We have not identified any indication that the networks of any other Rivers casinos were accessed during this incident. Further, no Betrivers online or mobile gaming platform, operations or systems were compromised or breached.

32.     Exhibit A also provides the following representation:

*What Information Was Involved*
The impacted files contained your name and driver's license and/or government ID number.

33.     Notably, the Notice Letter fails to give specificity as to how the information was stolen. The Notice Letter simply provides that:

*What We Are Doing*
We promptly engaged third-party cybersecurity support to assist with containing the incident and to help ensure the security of our systems. Further, we immediately launched an investigation in consultation with law enforcement and outside cybersecurity professionals to determine the nature and scope of the incident.

34. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities in Defendant's security system, and the remedial measures undertaken to ensure such a breach does not occur again.

35. Further, while Defendant became aware of the Data Breach no later than August 13, 2023, it took more than three months for Defendant to notify customers and to publicly reveal the breach.

36. Therefore, Plaintiff's and Class Members' PSI was at the mercy of cyber criminals for at least three months before Defendant began notifying victims of the Data Breach.

37. Defendant did not use reasonable security measures or procedures for the sensitive personal information they were maintaining on behalf of Plaintiff and Class Members, causing the exposure of Plaintiff's and Class Members' PSI.

***The Value of Sensitive Personal Information***

38. The Federal Trade Commission ("FTC") defines identify theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC explains that "identifying information" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person,"[2] including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport

---

[2] 17 C.F.R. § 248.201 (2013).

number, employer or taxpayer identification number."[3]

39.     The PSI of individuals remains of high value to criminals on the dark web. For example, PSI can be sold at a price ranging from $40 to $200.[4] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[5]

40.     Social Security numbers, which were compromised for some Class Members, are particularly problematic among the various PSI information that can be stolen because they can be used for a variety of fraudulent purposes and are often difficult for an individual to change. In fact, the Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by some Class Members, can lead to identity theft and extensive financial fraud.[6]

41.     Additionally, the process to change one's Social Security number is arduous and time extensive. An individual must complete significant paperwork and demonstrate evidence of legitimate misuse.

42.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

---

[3] *Id.*
[4] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[5] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/
[6] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf

43.     Similarly, driver's license numbers, which were compromised in the Data Breach, are incredibly valuable.

44.     According to national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you.
>
> Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

45.     Based on foregoing, the PSI compromised in the Data Breach is far more valuable than the loss of more basic retail account information. Unlike retail accounts such as credit or debit cards which may be cancelled with ease after being compromised, the information in the Data Breach is near impossible to "cancel" or change. As explained by Martin Walter, senior director at cybersecurity firm RedSeal, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[7]

46.     Fraudulent activity that is a consequence of the Data Breach may not be realized for several years after the breach. According to the U.S. Government Accountability Office ("GOA"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm

---

[7] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.htm

resulting from data breaches cannot necessarily rule out all future harm.[8]

***Defendant Knew or Should Have Known of the Risk of Data Breaches Given that Casinos in Possession of PSI are Particularly Susceptible to Cyber Attacks***

47.     Defendant's security obligations were especially critical given the substantial increase in cyber-attacks and/or data breaches targeting casinos that collect PSI, like Defendant.

48.     Companies like Defendant's are particularly targeted by cyber criminals due to the highly sensitive information they possess. Defendant knew and understood that unprotected PSI is valuable and highly sought after by cyber criminals who seek to illegally monetize PSI through unauthorized access.

49.     In the third quarter of the 2023 fiscal year alone, 733 organizations experienced data breaches, causing 66,658,764 individuals' personal information to become compromised.[9]

50.     Indeed, data breaches have become so frequent and notorious that the Federal Bureau of Investigation ("FBI") and the U.S. Secret Service have issued a warning to potential targets to ensure that they are aware of, and prepared for, potential cyber-attacks. The FBI has specifically stated in one report that smaller entities that store PSI are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

51.     As such, because of the increase in data breaches and the attendant risk of future

---

[8] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf
[9] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/
[10] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

attacks, such breaches were widely known and foreseeable to the public and for those in Defendant's industry, including Defendant.

52.     Despite public announcements stressing the importance of data security given the pervasive nature of data breaches, Defendant failed to take appropriate steps to protect the PSI of Plaintiff and Class members from being compromised.

53.     As a casino in possession of current and former patrons' and employees PSI, Defendant knew, or should have known, the importance of safeguarding and protecting the PSI entrusted to them by Plaintiff and Class Members. Further, Defendant should have appreciated the foreseeable consequences that would arise if Defendant's data security systems were ineffective and breaches, including, the significant costs that would be imposed on Plaintiff and Class members as a result of the breach.

54.     Defendant failed to take adequate cybersecurity measures to prevent the Data Breach and protect Plaintiff and the Class.

*Data Breaches are Preventable*

55.     Defendant could have prevented the Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PSI.

56.     Despite the pervasiveness of data breaches for businesses like Defendant, Defendant failed to implement reasonable security procedures and practices appropriate for the nature of the data they were maintaining on behalf of Plaintiff and Class Members, such as encrypting data or deleting it when no longer needed.

57.     To prevent and detect cyber attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following

preventative measures:

i.    Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

ii.    Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

iii.    Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

iv.    Configure firewalls to block access to known malicious IP addresses.

v.    Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

vi.    Set anti-virus and anti-malware programs to conduct regular scans automatically.

vii.    Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary

viii.    Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares

ix.    Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite application.

x.    Implement Software Restriction Policies (SRP) or other controls to prevent programs

from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

xi. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

xii. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

xiii. Execute operating system environments or specific programs in a virtualized environment.

xiv. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

58. To prevent and detect cyber attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates

- Use threat and vulnerability management

- Perform regular audit; remove privileged credentials;

**Thoroughly Investigate and Remediate Alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in Security Discussions**

---

[11] How to Protect Your Networks from RANSOMWARE, at 3, available at:
https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build Credential Hygiene**

- Monitor for adversarial activities
- Hunt for brute force intrusions/attempts
- Monitor for cleanup of Event Logs
- Analyze log-on events;

**Harden Infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[12]

59.     Defendant was negligent in safeguarding PSI despite the abovementioned measures and policies being widely known in the industry.

***Defendant Fails to Comply with FTC Guidelines***

60.     The FTC has promulgated guidelines for businesses which demonstrate the importance of implementing reasonable data security practices.

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a- preventable-disaster/

61.     In the FTC's *Protecting Personal Information: A Guide for Business* from 2016, the guide establishes cyber-security guidelines for businesses. The guidelines recommend that businesses should protect personal consumer information that is kept internally, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.

62.     The FTC's guidelines also recommend that businesses use an intrusion detection system to expose data breaches as they occur in real time, monitor all incoming traffic for activity indicating someone is attempting to hack the system, watch for large or unusual amounts of data being transmitted from the system, and finally have a vigorous response plan in the event of a breach.

63.     FTC guidelines further recommends that companies do not maintain PSI longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords for network access, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

64.     Failure to abide by FTC guidelines has brought enforcement actions against businesses for failing to protect consumer data reasonably. The FTC has treated the failure to safeguard data against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45.

65.     Defendant has failed to properly implement basic data security practices, and its

16

failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PSI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Failed to Comply with Industry Standards***

66.     As discussed above, cyber security experts have routinely identified entertainment companies, like Defendant, as being particularly vulnerable to cyber-attacks because of the immense value of PSI.

67.     Cyber experts have identified that minimum standards should be implemented by entertainment companies, like Defendant, that are in possession of PSI, including but not limited to: educating all consumers, strong passwords, multi-layer security (including firewalls, anti-virus, and anti-malware software), encryption, making data unreadable without a key, multi-factor authentication, backup data and limiting which consumers can access sensitive data. Defendant failed to follow these industry best practices.

68.     Other industry-standards that are recommended include: installing appropriate malware detection software, monitoring and limiting the network ports, protecting web browsers and email management systems, setting up network systems such as firewalls, switches and routers, monitoring and protection of physical security systems, protection against any possible communication system, training staff regarding critical points. Defendant failed to follow these cybersecurity best practices.

69.     Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1,

PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

70.     Upon information and belief, Defendant failed to comply with at least one, if not all, of these accepted standards, thereby inviting the threat of cyber criminals to conduct the Data Breach.

### *Defendant's Breach*

71.     Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because of its failure to properly maintain and safeguard its computer systems, networks, and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

i.      Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

ii.     Failing to adequately protect customers' and employees' PSI;

iii.    Failing to properly monitor its own data security systems for existing intrusions, encryptions, brute-force attempts, and clearing of event logs;

iv.     Failing to apply all available security updates;

v.      Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

vi.     Failing to practice the principle of least-privilege and maintain credential hygiene;

vii.         Failing to avoid the use of domain-wide, admin-level service accounts;

viii.        Failing to employ or enforce the use of strong randomized, just-in-time local administrator passwords, and;

ix.         Failing to properly train and supervise employees in the proper handling of inbound emails.

72.      Accordingly, Defendant has negligently safeguarded Plaintiff's and Class Members' PSI.

***Common Injuries and Damages***

1.      As a result of Defendant's ineffective security practices, the Data Breach, and the foreseeable consequences of PSI being misappropriated by criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injurie and damages, including: (i) invasion of privacy; (ii) theft of their PSI; (iii) lost or diminished value of PSI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PSI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PSI.

***The Increased Risk of Identity Theft for Victims of the Data Breach***

73.      Plaintiff and Class Members are at a heightened risk of identity theft for the

foreseeable future.

74.     Data breaches often lead to identify theft. Cyber criminals that acquire and monetize PSI by selling it on the black market to other criminals.

75.     Further, cyber criminals need only to rely on pieces of PSI data to assume or track the victim of a data breach.

76.     For example, armed with just a name and date of birth, a data thief can engage in "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking by which a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means like spam calls or phising emails. Data breaches are often the starting point for social engineering attacks.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

77.     When a Data Breach occurs, and an individual is notified that their PSI was compromised, the reasonable person must take steps to address the breach and attempt to mitigate the risk of becoming the victim of identity theft or other fraud.

78.     Plaintiff and Class Members have spent, and will continue to spend additional time in the future, attempting to remedy the harms that they have or already have experienced as a result of the Data Breach. These actions could include researching the legitimacy of the Data Breach and monitoring their financial and personal accounts for fraudulent activity, an endeavor that could takes years to detect.

79.     Indeed, the U.S. Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face

"substantial costs and time to repair the damage to their good name and credit record."[13]

***Loss of the Benefit of the Bargain***

80.    Defendant's lackluster data security has deprived Plaintiff and Class Members of the benefit of the bargain. When agreeing to pay Defendant and/or its agents for their entertainment products and/or services, Plaintiff and other reasonable patrons and employees understood and expected that they were paying, in part, for both entertainment products and/or services in addition to the necessary data protection measures instituted for the maintenance and security of PSI. Defendant failed to provide the reasonably expected security measures. Accordingly, Plaintiff and Class Members received entertainment products and/or services and/or employment positions that were of a lesser value than what they reasonably expected to receive under the bargain communicated with Defendant.

***Facts Specific to Plaintiff Hess***

81.    Plaintiff Donald Hess was a customer at Rivers Casino throughout 2020, accessing entertainment products and/or services two to three times per month.

82.    To access entertainment products and/or services at Rivers Casino, Plaintiff had to provide his PSI to Defendant, including his name, date of birth, and Social Security Number.

83.    At the time of the Data Breach, Defendant retained Plaintiff's PSI in its system.

84.    Plaintiff Donald Hess received the Notice Letter, by letter, from Defendant, dated November 30, 2023. According to the Notice Letter, Plaintiff's PSI was improperly accessed and

---

[13] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

obtained by unauthorized third parties, including his name and/or driver's license and/or government ID number.

85.     Plaintiff suffered actual injury from having his PSI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PSI; (iii) lost or diminished value of PSI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PSI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PSI.

86.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

87.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

88.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

89.     Plaintiff Donald Hess has a continuing interest in ensuring that his PSI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

22

## CLASS ACTION ALLEGATIONS

90.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

91.  Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

92.  Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All natural persons residing in the United States whose PSI was compromised in the Data Breach announced by Defendant on or about November 30, 2023.

93.  Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members. Additionally, excluded from the class are any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant.

94.  Plaintiff reserved the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

95.  Numerosity. The members of the Class are so numerous that joinder of all of them is impracticable. Although the precise number is currently unknown to Plaintiff and exclusively in the possession of Defendant, upon information and belief, tens of thousands of individuals' PSI was compromised in the Data Breach.

96.  Commonality. There are questions of law and fact common to the Class, which

predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PSI;

b)  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyber attack;

c)  Whether Defendant's data security systems prior to and during the cyber-attack complied with applicable data security laws and regulations;

d)  Whether Defendant's data security systems prior to and during the cyber-attack were consistent with industry standards;

e)  Whether Defendant owed a duty to Class Members to safeguard their PSI;

f)  Whether Defendant breached its duty to Class Members to safeguard their PSI;

g)  Whether computer hackers obtained Class Members' PSI in the cyber attack;

h)  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i)  Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j)  Whether Defendant owed a duty to provide Plaintiff and Class Members notice of this data breach, and whether Defendant breached that duty;

24

k)      Whether Defendant's conduct was negligent;

l)      Whether Defendant's acts, inactions, and practices complained of

herein amount to an invasion of privacy;

m)      Whether Defendant's actions violated federal law; and

n)      Whether Plaintiff and Class Members are entitled to damages, civil

penalties, and/or injunctive relief

97.     Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the cyber attack.

98.     Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

99.     Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

100.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by

individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

101.    Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## COUNT I
### Negligence
### (By Plaintiff Individually and on Behalf of the Class)

102.    Plaintiff hereby realleges and incorporates by reference all of the allegations in paragraphs 1 through 101.

103.    Defendant routinely handles PSI that is required of their customers, such as Plaintiff.

104.    By collecting and storing the PSI of its customers, Defendant owed a duty of care to the individuals whose PSI it collected to use reasonable means to secure and safeguard that PSI.

105.    Defendant is aware of that duty of care to the PSI of its customers.

106.    Defendant has full knowledge of the sensitivity of the PSI and the types of harm that Plaintiff and Class Members could and would suffer if the PSI were wrongfully disclosed.

107.    Defendant knew or reasonably should have known that its failure to exercise due care in the collecting, storing, and using of their customers' PSI involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a

third party.

108.   Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiff's and Class Members' information  in Defendant's possession was adequately secured and protected.

109.   Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class Members' PSI.

110.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

111.   Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of should have known of the inherent risks in collecting and storing the PSI of Plaintiff and the Class, the critical importance of providing adequate security of that PSI, and the necessity for encrypting PSI stored on Defendant's systems.

112.   Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiff's and Class Members' PSI, including basic encryption techniques freely available to Defendant.

113.   Plaintiff and the Class Members had no ability to protect their PSI that was in, and possibly remains in, Defendant's possession.

27

114.    Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

115.    Defendant had and continues to have a duty to adequately disclose that the PSI of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PSI by third parties.

116.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PSI of Plaintiff and Class Members.

117.    Defendant has admitted that the PSI of Plaintiff and Class Members was purposely exfiltrated and disclosed to unauthorized third persons as a result of the Data Breach.

118.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PSI of Plaintiff and Class Members during the time the PSI was within Defendant's possession or control.

119.    Defendant improperly and inadequately safeguarded the PSI of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

120.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PSI it had in its possession in the face of increased risk of theft.

121.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of the PSI of patients of its customers.

28

122.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

123.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, the PSI of Plaintiff and Class Members would not have been compromised.

124.    There is a close causal connection between Defendant's failure to implement security measures to protect the PSI of Plaintiff and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and the Class.  Plaintiff's and Class Members' PSI was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PSI by adopting, implementing, and maintaining appropriate security measures.

125.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PSI is used; (iii) the compromise, publication, and/or theft of their PSI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PSI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PSI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PSI of its employees and former employees in its possession; and (viii) future costs in terms

29

of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PSI compromised as a result of the Data Breach for the remainder of Plaintiff's and Class Members' lives.

126.   Additionally, as a direct and proximate cause of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PSI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PSI in its continued possession

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (By Plaintiffs Individually and on Behalf of the Class)

127.   Plaintiff incorporates by reference all previous allegations in paragraphs 1 through 101 as though fully set forth herein.

128.   Plaintiffs and Class members were required to provide their PSI to Defendant as a condition of doing business with Defendant.

129.   Plaintiff and the Class entrusted their PSI to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

130.   In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

131.   Implicit in the agreement between Plaintiffs and Class Members and the Defendants

30

to provide PSI, was the latter's obligation to: (a) use such PSI for business purposes only, (b) take reasonable steps to safeguard that PSI, (c) prevent unauthorized disclosures of the PSI, (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PSI, (e) reasonably safeguard and protect the PSI of Plaintiff and Class members from unauthorized disclosure or uses, (f) retain the PSI only under conditions that kept such information secure and confidential.

132. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

133. Defendant solicited, offered, and invited Plaintiff and Class Members to provide their PSI as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PSI to Defendant.

134. In accepting the PSI of Plaintiff and Class members, Defendant understood and agreed that it was required to reasonably safeguard the PSI from unauthorized access or disclosure.

135. Upon information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby they expressly promised Plaintiff and Class members that they would only disclose PSI under certain circumstances, none of which relate to the Data Breach.

136. Upon information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class members' PSI would remain protected.

137. Plaintiff and Class members paid money and provided their PSI to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

31

138.    Plaintiff and Class members would not have entrusted their PSI to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

139.    Plaintiff and Class members would not have entrusted their PSI to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

140.    Plaintiff and Class members fully and adequately performed their obligations under the implied contracts with Defendants.

141.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

142.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

143.    Plaintiff and Class members are entitled to compensatory, consequential, and nominal damage suffered as a result of the Data Breach.

144.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

## COUNT III
## Unjust Enrichment, in the Alternative

**(By Plaintiff Individually and on Behalf of the Class)**

145.    Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 101.

146.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of storing their PSI with Defendant in such a way that saved expense and labor for Defendant.

147.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' PSI, as this was used by Defendant to facilitate its core functions.

148.    The benefits given by Plaintiff and Class Members to Defendant were to be used by Defendant, in part, to pay for or recoup the administrative costs of reasonable data privacy and security practices and procedures.

149.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial.

150.    Under principles of equity and good conscience, Defendant should not be permitted to retain a benefit belonging to Plaintiff and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members granted to Defendant or were otherwise mandated by federal, state, and local laws and industry standards.

151.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds or benefits it received as a result of the conduct alleged herein.

**COUNT IV**

33

**Invasion of Privacy**

**(By Plaintiff Individually and on Behalf of the Class)**

152.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 101.

153.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PSI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

154.     Defendant owed a duty to its customers, including Plaintiff and the Class, to keep this information confidential.

155.     The unauthorized acquisition (*i.e.*, theft) by a third party of Plaintiff's and Class Members' PSI is highly offensive to a reasonable person.

156.     The intrusion was into a place or thing which was private and entitled to be private.

157.     Plaintiff and the Class disclosed their sensitive and confidential information to Rivers as part of their business with Rivers Casino, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

158.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

159.     Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

160.     Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their

mitigation efforts.

161.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

162.    As a proximate result of Defendant's acts and omissions, the private and sensitive PSI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

163.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PSI are still maintained by Defendant with their inadequate cybersecurity system and policies.

164.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PSI of Plaintiff and the Class.

165.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, requests judgment against the defendant and the following:

A.      For an Order certifying the Class as defined herein, and appointing Plaintiff and their counsel to represent the Class;

35

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class Members' PSI;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff and Class Members' personal identifying information;

    iv.   prohibiting Defendant from maintaining Plaintiff's and Class Members' personal identifying information on a cloud-based database (if, in fact, it does so);

    v.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party

security auditors;

vi. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the

preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

38

F.      For pre- and post-judgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: December 14, 2023             Respectfully Submitted,

By: */s/ John D. Blythin*
John D. Blythin
ADEMI LLP
3620 E. Layton Ave.
Cudahy, WI 53110
Tel: (414) 482-8000
Fax: (414) 482-8001

*Attorney for Plaintiff*
*and the Putative Class*

39